IN THE UNITED STATES DISTRICT COURT
OF SOUTHERN MISSISSIPPI
EASTERN DIVISION

KEITH BARNETT                                              PLAINTIFF

VS                                      CAUSE NO. 2:14CV-34KSMTP

LAWRENCE COUNTY SHERIFF DEPARTMENT,
CHRISTIAN SEAN DAVIS, INDIVIDUALLY,
AND IN HIS PHYSICAL CAPACITY,
JOHN DOES 1,2,3,4

**DEPOSITION OF CHRISTIAN SEAN DAVIS**

Taken at the Lawrence County Courthouse located in Monticello, Mississippi on January 22, 2015 beginning at approximately 10:00 A.M.

APPEARANCES:

    EDWIN L. BEAN, Jr., ESQUIRE
    ATTORNEY AT LAW
    729 DELAWARE AVENUE
    MCCOMB, MISSISSIPPI 39648
        ATTORNEY FOR PLAINTIFF

    KRISTIE R. BROWN, ESQUIRE
    DANIEL COKER HORTON & BELL
    1712 15TH STREET, #400
    GULFPORT, MISSISSIPPI 39501
        ATTORNEY FOR DEFENDANTS

REPORTED BY:

    PELMA DIANNE STRINGER, CSR-1300
    P. O. BOX 365
    MCCOMB, MISSISSIPPI   39649


EXHIBIT H

1    Q.    And what was your job responsibility at Hinds
2    County Sheriff Department?
3    A.    I was a detention officer.
4    Q.    As a detention officer, did Hinds County Sheriff
5    Department send you to any type of police training academy
6    or highway patrol academy?
7    A.    Detention officer training.
8    Q.    And where was that?
9    A.    Hinds County Sheriff Department.
10   Q.    Tell me the things what you were trained on as a
11   detention officer.
12   A.    How to control inmates, handcuffing, OC spray and
13   proper procedure in paperwork.
14   Q.    Was that training, Officer Davis, done internally
15   in the Hinds County Sheriff Department and it was not done
16   in an outside academy or training facility?
17   A.    Internally.
18   Q.    And do they have manuals they gave you to read or
19   a video you watched or what did that training consist of?
20   A.    Manuals.
21   Q.    Did you go through any type of actual hands-on
22   training where you used an individual as a suspect or an
23   inmate and you were wrestle him to the ground or anything
24   like that?
25   A.    No, sir.

```
1     Q.   Where were you sent?
2     A.   The taser certification would go through Taser
3  International.
4     Q.   Where was that located?
5     A.   It was next door to the sheriff department.
6     Q.   So they came to Lawrence County?
7     A.   Yes, sir.
8     Q.   In that class, did you get any kind of manuals?
9     A.   Yes, sir.
10    Q.   That you could keep?
11    A.   Yes, sir.
12    Q.   Did you keep your manuals that you were given in
13 taser training by Taser International?
14    A.   It was a CD.
15    Q,   Did you keep the CD?
16    A.   I believe I still have it.
17    Q.   Will you provide a copy of that to your counsel
18 please?
19    A.   Sure.
20    Q.   How long did that course take a day, two days, a
21 week?
22    A.   It was two days.
23    Q.   Were any live demonstrations given during that
24 training?
25    A.   Yes, sir.
```

```
 1      Q.    Live demonstrations on fellow officers?
 2      A.    Yes, sir.
 3      Q.    Were you tased?
 4      A.    No, sir.
 5      Q.    Did you tase anybody?
 6      A.    No, sir.
 7      Q.    So there was one demonstration given between an
 8   officer and another officer or was it an employee of Taser
 9   International that tased an officer?
10      A.    As far as tasing someone directly, I did not tase
11   someone only in a SIM suit, I did.
12      Q.    Explain that to me.
13      A.    SIM suit. It is a simulator suit. That is what
14   they call it.
15      Q.    So you tased a person in the suit that is being
16   shot?
17      A.    Correct.
18      Q.    You are trained on how to use the gun itself?
19      A.    Correct for an instructor. I was already
20   certified as a taser. I decided to go through the
21   instructor's school.
22      Q.    The course that we are talking about where Taser
23   International trained you, that is not your certification?
24      A.    No, sir.
25      Q.    That is your basic taser training?
```

1    A.    Yes, sir.

2    Q.    Where did you get your certification?

3    A.    Through Taser International through a certified
4 instructor at the same location in 2005.

5    Q.    And your other training course was in when?

6    A.    In 2005. Instructor training was 2013.

7    Q.    Describe the difference to me between basic taser
8 training and taser instructor training.

9    A.    Basically just paperwork. There is more paperwork
10 when I have to certify somebody. As far as the use of it is
11 the same as whether you are an instructor or basic
12 certified.

13   Q.    So it is the paperwork that qualifies you as an
14 instructor?

15   A.    Yes.

16   Q.    In any one of those courses were you tased?

17   A.    Yes, sir.

18   Q.    Which one were you tased in?

19   A.    The first basic course.

20   Q.    And that was in 2005?

21   A.    Yes, sir.

22   Q.    What did it feel like?

23   A.    I did not want to go again.

24   Q.    Did it knock you unconscious?

25   A.    No, sir.

```
 1   part-time certification and be trained as a part-time
 2   officer at that time.
 3        Q.   So that was a decision that he made?
 4        A.   He asked me and I allowed him to come.
 5        Q.   But by protocol he was not required to. This is
 6   something he elected to do on his own and you agreed to let
 7   him come, is that a fair statement?
 8        A.   Yes, sir.
 9        Q.   Officer VanSinderen, how long had he been on the
10   force at this point and time, do you know?
11        A.   I cannot recall.
12        Q.   Was he there working when you came back to the
13   sheriff department in 2009?
14        A.   No, sir.
15        Q.   What was his rank on July 2013?
16        A.   Patrol officer.
17        Q.   Did y'all go in separate vehicles that day or in
18   one unit?
19        A.   Separate vehicles.
20        Q.   Tell me what happened in your own words.
21        A.   I left the sheriff department and traveled south
22   on 27 to go to the location 8 Hammond Road. Deputy
23   VanSinderen followed myself in his patrol unit. Upon
24   arriving in route we were contacted again through dispatch
25   that stated that Mr. Keith Barnett was on the porch waiving
```

1  his hammer around in an aggressive manner. He still had
2  the caller on line, I believe. Upon arriving there, they
3  had two porches. We didn't know which porch it was. I
4  pulled in the first driveway, and I believe Officer
5  VanSinderen pulled in the second driveway. He was not on
6  the front porch at that time so I figured he was on the
7  back porch. Upon walking to the back porch--
8      Q.   Hold on. Where was Mr. Taylor at this point?
9      A.   He was behind me somewhere around the car.
10     Q.   So was he walking with you or walking with
11 Officer VanSinderen?
12     A.   He was staying around the car. I told him he
13 needed to stay around the car.
14     Q.   And the car being your car or his car?
15     A.   My car.
16     Q.   Tell me where your car was parked in relation to
17 the house.
18     A.   Hwy 27 take a left on Hammond Road. Their house
19 is on the corner.
20     Q.   Right.
21     A.   They have a circled driveway. The first driveway
22 on the west side of the yard.
23     Q.   And the fireworks stand is between their house
24 and 27; is it not?
25     A.   Yes, sir.

```
 1   corner since it was not on the front porch. I knew they ahd
 2   a back porch so I walked to the corner to see if I could
 3   look around back to see if they were on the back porch. AT
 4   that time I heard Trooper Fortenbarry say, "He is coming
 5   out the front door."
 6       Q.   Do you know where he was when he aid that to you?
 7       A.   Behind me by the front door.
 8       Q.   Now you arrived at the residence that day, tell
 9   me what crime you observed Mr. Fortenbery committed.
10            MRS. BROWN: I object to the form.
11       A.   I didn't observe Officer Fortenberry commit a
12   crime.
13       Q.   What crime did you observe Mr. Barnett committing
14   when you got to the residence?
15       A.   He come out of the residence with a hammer
16   waiving and yelling and cursing.
17       Q.   And at that point, was that a crime?
18       A.   Disturbing the peace.
19       Q.   It was on his front porch, right?
20       A.   Still it is a domestic disturbance.
21       Q.   Did you make any efforts to talk to Mrs. Barnett?
22       A.   No, sir.
23       Q.   Do you know whether or not dispatch still had her
24   on the phone at the time you arrived at the residence?
25       A.   I don't know.
```

```
 1      Q.    He was waiving the hammer and hollering.  What
 2   was he hollering?
 3      A.    He said he wanted his money.
 4      Q.    Okay. Did you ask him what he was talking about?
 5      A.    Yes, sir.
 6      Q.    Tell me what the conversation was.
 7      A.    He said that Tangi stole some money from him and
 8   it was in her vehicle. And he was going to get it out one
 9   way or the other.
10      Q.    And that conversation took place on the porch?
11      A.    Once he got on the ground. He walked off the
12   porch.
13      Q.    So he came off the porch with the hammer?
14      A.    Yes, sir.
15      Q.    Was he waiving the hammer at you?
16      A.    No, sir.
17      Q.    At any other officers?
18      A.    He was waiving it in the air.
19      Q.    And that was a ball peen hammer, right?
20      A.    Yes, sir.
21      Q.    How long did you talk to him there in the front
22   of the house while he was waiving the hammer?
23      A.    Maybe two minutes.
24      Q.    And y'all were still talking about he wanted the
25   money that she stole from him?
```

1  at this time 2013?  Do you know whether he was?
2      A.   I don't know.
3      Q.   Well, you are the certifier, right?
4      A.   Not for them. There were individuals already
5  certified.
6      Q.   Did you ever recertify them before July 2013?
7      A.   No, sir.
8      Q.   Patrolman Fortenberry. Did you see what weapons
9  he had on his person at this point and time?
10     A.   No, sir.
11     Q.   You told me earlier the conversation took place
12 about two minutes?
13     A.   Yes, sir.
14     Q.   During that conversation, did Mr. Barnett put the
15 hammer down?
16     A.   It took about two or three minutes to get him to
17 put the hammer down.
18     Q.   Where did eh put it?
19     A.   He threw it on the ground.
20     Q.   In front of the porch?
21     A.   At the corner of the porch.
22     Q.   When he threw the hammer down, did he throw it in
23 a fashion that would impose any danger to you and any of
24 the officers?
25     A.   He through it up in an upset manner.

```
 1   And he starts getting a little upset. I almost calmed him
 2   down at that point. And then the next thing I believe he
 3   heard Mrs. Tangi come out of the house.
 4        Q.   I don't want to know what you believe, tell me
 5   what you saw and what you heard.
 6        A.   I heard something shut over here.
 7        Q.   Do what now?
 8        A.   I heard something shut like a door.
 9        Q.   Okay.
10        A.   I saw Mr. Barnett look to his left and started
11   walking toward Tangi.  And I told him he wasn't going over
12   there, he was going to talk to me.  He looked at me and
13   said, "Are you nuts?" And then the next thing I know, he
14   said something about bringing my taser to the front because
15   he stated getting very aggressive when I told him he was
16   not going to talk to his wife, he was going to finish
17   talking to me. We were going to find out what was going
18   one. He raised his hands and made a fist and said, "Hit
19   me," and launched toward me.  And at that point is when I
20   tased him.
21        Q.   Did you have OC spray available?
22        A.   Yes.
23        Q.   Tell me why you tased him rather than spraying
24   him.
25        A.   Our departmental policy is we tase before we
```

```
 1   have been to the booking officer?
 2        Q.   Did you ever sign a custody transfer form for
 3   that phone?
 4        A.   No, sir.
 5        Q.   Did they ever sign a form for that phone?
 6        A.   No, sir.
 7        Q.   The taser has different settings, does it not?
 8        A.   No, sir.
 9        Q.   So it is one setting?
10        A.   Yes, sir.
11        Q.   And you determine how long the jolt is for,
12   right?
13        A.   It is for one (five second cycle).
14        Q.   One five second cycle?
15        A.   Yes, sir.
16        Q.   Where did you hit him with the taser?
17        A.   The lower abdomen.
18        Q.   One cycle?
19        A.   One cycle.
20        Q.   And when did you hit him with that one cycle,
21   what happened?
22        A.   He went to his knees and then went on his
23   stomach.
24        Q.   Then what happened?
25        A.   He was given the instructions to put his hands
```

1  Q.  Did you see him assault anyone with the hammer?
2  A.  No, sir.
3  Q.  Your self or Mrs. Barnett or anyone else?
4  A.  No, sir.
5  Q.  How did you arrive at that charge?
6  A.  It was a domestic situation, and he had a hammer
7  making threatening commits with the hammer.
8  Q.  That is my next question. Did he threaten you
9  with a hammer?
10 A.  No, sir.
11 Q.  Was any other officers present?
12 A.  No.
13 Q.  Did he threaten Mrs. Barnett in your presence
14 with the hammer?
15 A.  No, sir.
16 Q.  The second charge is disorderly conduct. What is
17 the factual basis behind that charge?
18 A.  Yelling, screaming, coming out of the house
19 waiving the hammer around in the air.
20 Q.  Tell me what your definition is of disorderly
21 conduct?
22 A.  His conduct anything that is uncivil or anything
23 that is unruly.
24 Q.  Was he at any time during this encounter you had
25 with him that day Officer Davis on public property?

1   A.   No, sir.

2   Q.   Would it be fair to say that everything he did
3   during this encounter with you and the other officers that
4   day was on his own personal property?

5   A.   Correct.

6   Q.   The other charge failure to obey. Tell me what
7   factual basis was behind that charge.

8   A.   He failed to obey about seven or eight orders to
9   put the hammer down. He failed to obey stop whenever he was
10  told to stop and talking to me. He failed to stop whenever
11  he was told to stop and talk to me, he kept walking away.
12  He failed to obey to stop putting his hands in his pocket
13  when he was told to. He failed to obey when he was told to
14  stop again upon arriving at the vehicles. And he tried to
15  leave and go talk to his wife.

16  Q.   Now what is your interpretation of the statute
17  while on that charge?

18  A.   Lawful word comply.

19  Q.   Is that lawful order in your opinion to be based
20  on the fact that the suspect on the person you are giving
21  that word to committing a crime at that time?

22  A.   No, sir.

23  Q.   So your interpretation of the statute is you have
24  been telling me right now to do something as a law
25  enforcement officer and I can do it. Is that right?

1    A.    If it is a lawful command.

2    Q.    That is my question. What, in your opinion, gives
3 you the right to give the individual a lawful command?

4    A.    Probable cause for me being there.

5    Q.    So if you have probable cause for being there
6 then in your opinion you have a right to give an individual
7 a lawful command to do or not do something?

8    A.    Right.

9    Q.    What was you cause for being there?

10   A.    Mrs. Tangi Barnett called 9-1-1 to her husband
11 Keith Barnett had a hammer and was waving it around
12 threatening to bust all their windows out.

13   Q.    Okay. Now between the time you filed the charge,
14 I am assuming you filed the charge the same day, right?

15   A.    I believe so.

16   Q.    Between that time and the time that Mr. Barnett
17 was to show up in justice court for a hearing on the
18 charges, did you have any more contact with Keith Barnett?

19   A.    No, sir.

20   Q.    Did you have any contact with Mrs. Barnett?

21   A.    Yes,

22   Q.    Tell me about those contacts and what it was all
23 about.

24   A.    Mrs. Tangi Barnett came to the office after the
25 fact of the situation and wrote out a statement for me

1   about what happened. Again, she apologized to me for me
2   having to go out there. I apologized to her how the
3   situation, I hate how it happened, but I had no choice. She
4   agreed with me. That she understood. She didn't want any of
5   it to happen, but she wanted to get some rings and stuff,
6   and the situation between her and her husband. And then of
7   course we kind of let it die down through work and we just
8   had our normal working relationship.
9       Q.   Did she ever beg you or ask you to dismiss the
10  charges?
11      A.   The day before court, I had heard that she wanted
12  me to drop the charges. And I came and asked her what she
13  wanted me to do, and she said that she did not want to
14  press the charges on Keith that she wanted it to be
15  resolved. I asked her again, what do you want me to do? Do
16  you want me to help you out the best I can? And she said,
17  yes, please.
18      I told her I could help her out with the misdemeanor
19  charges, but the felony I could take it straight to grand
20  jury instead of going through justice court and having him
21  to pay for attorney fees. I could help him out on that
22  point and the embarrassment of going everybody in front of
23  the witnesses in the justice court hearing their personal
24  problems.
25      Q.   Right.

## CERTIFICATE OF COURT REPORTER

I, Pelma Dianne Stringer, Notary Public in and for the County of Pike County, State of Mississippi, hereby certify that the foregoing 82 pages, and including this page, contain true and correct transcript of the taped proceedings, and later reduced to typewritten form by computer-aided transcription under my supervision to the best of my skill and ability.

I further certify that the witness was placed under oath to truthfully answer all questions in this matter under the authority vested in me by the State of Mississippi.

I further certify that I am not in the employ of or related to, any counsel or party in this matter, and have no interest, monetary or otherwise, in the final outcome of the proceedings.

Witness my signature and seal this the \_\_\_\_ day of _____, 2015.

---

PELMA DIANNE STRINGER, CSR-1300

MY COMMISSION EXPIRES AUGUST 20, 2017